ESTATE OF RADEL : FOGO, Appellant, vs. WANLESS and others, Respondents.

*March 15—April 12, 1946.*

*Franklin E. Fogo* of Richland Center, for the appellant.

*Van R. Coppernoll* and *F. L. Brewer,* both of Richland Center, for the respondents.

WICKHEM, J. The sole question in this case is whether the findings of the trial court are against the great weight and clear preponderance of the evidence. This requires a statement of the facts.

Decedent, a resident of Richland county, died testate on November 24, 1944. He left surviving him two daughters and three sons, as well as several brothers and sisters. By the will of November 6, 1944, the estate was left to a brother to the exclusion of decedent's children. Decedent was committed to the Mendota State Hospital for the Insane on February 23, 1932, released on parole on December 29, 1936, and was never thereafter required to return to the institution. On May 2, 1933, the then wife of decedent was appointed his guardian. At that time he had no property of any kind except that under an insurance policy certain payments were to be made to decedent if he became totally disabled. The guardianship was to permit the wife to receive the benefits and to use the same for the support of the children. The payments were discontinued after decedent's discharge from the hospital. In 1935 decedent's wife secured a divorce from decedent and was awarded custody of the children. No support money was required to be paid by decedent. In December, 1936, decedent returned to Richland county and made his

home with his mother who owned a farm of eighty acres in the town of Buena Vista, as well as a house and lot in the city of Richland Center. Decedent operated the farm for his mother until her death in January, 1944, at which time he received as beneficiary under her will real estate and personal property of the total value of $8,747, the real estate being incumbered in the sum of $3,400. This estate was assigned to decedent about two months before his death. Immediately before the assignment, decedent's wife petitioned the court to have the divorce decree modified to require Radel to pay support money for those of the children who were still minors. This culminated in an order requiring decedent to pay $45 per month support money. After the return of decedent from Mendota he saw his children occasionally. According to the evidence, decedent operated the farm in a satisfactory manner, although the administrator was technically in control of the property. After the closing of the estate decedent continued to operate the farm. In September, 1944, it was necessary for decedent to be hospitalized, due to a dropsical condition, and at intervals various trips to the hospital were necessary thereafter. A mortgage on the farm was held by the Federal Land Bank of St. Paul. Decedent wished to pay off this loan and to carry the mortgage locally. He made arrangements accordingly and the transaction was completed on November 6, 1944. On this date the will in question was drawn. On the same day he called at various business houses and paid some bills. On November 10th he had to go to the hospital again because of his dropsical condition, leaving the hospital on the 13th. On the 17th he became worse, was removed to the hospital and died on November 24th. This is a very close case and a statement of facts in some detail is called for.

The evidence of contestants was to the effect that during the year 1944 decedent's house was untidy and unkept; that there were spoiled food and dirty dishes about the place continuously; that decedent was cruel to the animals, and that this

latter conduct was a recent development, although it resembled his conduct immediately prior to his commitment in 1932; that decedent went about the house talking to himself; that he expressed the fear that people would burn his buildings; that he was suspicious that people were stealing his property; that he would get up every hour or so during the night and every time a car drove up the road and would stand at the window because of the fear that somebody was coming to take or to injure his property. The whole place was secured with padlocks, windows were nailed, etc. He was very forgetful and untidy; he kept several butcher knives freshly sharpened in the dresser in the bedroom where he slept; he was sane occasionally for short spaces of time but insane most of the time up to July, 1944; he spent lots of time just staring; he had dismantled some of the furniture at the farm; that it was impossible to carry on a conversation with him during October and November of 1944. He made a statement that an ordinary calendar on the farm was the most paying thing on the farm because you can look at it any time you want to and know what time of the month it is; he made remarks that did not make sense; he frequently refused to enter into conversations with friends; he tore up the horse barn floor because he had dropped some change; he dug a hole for a toilet very much oversize for that purpose and then never finished the structure. The foregoing is a fair sample of the evidence of lay witnesses for contestants, each of whom, on the basis of the above or similar facts, expressed the opinion that he was not competent to execute a will.

The medical testimony offered by contestants may now be summarized. Dr. August Sauthoff, assistant superintendent of the Mendota State Hospital, testified that in 1932, when decedent was received at the hospital, he was suffering from mental paralysis and syphilis; that he was suffering from a condition known as paresis, the principal cause of which is syphilis. His testimony is that victims of paresis rarely if

ever recover, although they seem sometimes to recover or improve but the improvement is always followed by relapse due either to the advancing of the disease itself or the onslaught of any acute illness.   Dr. Sauthoff doubted if the decedent could have been competent on November 6th, the date of the will; stated that his release would not indicate recovery, and that every person suffering from paresis is incompetent; that to the knowledge of the witness decedent was incompetent when released in 1936 and, although witness had not seen him since, he was strongly of the opinion that the incompetency persisted. On the other hand, the witness said that in spite of his disease, he might be able to buy and sell articles as well as to handle his bank account, operate a farm, do his banking and, to a certain extent, handle his business affairs, provided these were not too complicated.   He stated that the victim of paresis becomes drowsy, fails to keep up appearances, becomes headstrong, absent-minded, and his attention is hard to arouse and to hold; he cannot plan or criticize and his judgment is bad. The brain tissue is actually destroyed by the disease, and to the extent that it is, the intellect is permanently gone; it cannot come back.    The second medical witness, Dr. Bowen, had been acquainted with decedent for fifteen or twenty years; had treated him as physician up to October 14, 1944, and particularly between the dates of August 18 and October 14, 1944. The last time he treated decedent was October 14th at which time he turned him over to another doctor.   He states that he had a talk with decedent about the 10th or 11th of October and possibly one around Armistice Day; that decedent was rambling and forgetful and so demented that he couldn't talk to him very much; that he was progressively worse physically, and that he was incapable of understanding and executing a will; that during the period from August 18th to October 14th he was rational some of the time, but that from October 18th until about the middle of November he was completely incompetent.    The doctor did not see him on November 6th but saw

him casually at the hospital on one or two occasions in November.

For the proponent there was evidence by lay witnesses who knew decedent and saw him over the period in question, and this evidence was all to the effect that he was of sound mind at the time that the will was drawn. These included the witnesses and draftsman of the will. The superintendent of the hospital where decedent was treated testified that about the time of the will testator was perfectly rational. Other witnesses expressed the same view.

The difficulty of the case is caused by the rather vague quality of most of contestants' testimony. Oddities, eccentricities, slovenliness, and the like, together with inability to carry on a conversation, and absent-mindedness, are about all that can be made of this evidence, although in each case it is coupled with an opinion adverse to decedent's competency. The strongest evidence, of course, is that of the doctors. That of Dr. Sauthoff indicates that paresis is permanently disabling. On the other hand, even Dr. Sauthoff testified that decedent would be competent to conduct simple business operations, and among these he included farming and taking care of his bank account. This, of course, would not exclude competency to make a will. He had not seen decedent for six years and, in view of his testimony that paresis victims can show improvement, or apparent improvement, his evidence cannot be given weight except in so far as it establishes the fact that paresis results in a permanent injury with the likelihood of further mental deterioration due to its own progress or the onslaught of any acute illness. Dr. Bowen's testimony is more positive. He treated decedent as late as the middle of October and testifies that he was irrational and wholly incapable of making a will from this time till his death. If the evidence for contestants can be said to preponderate, it must be on the basis of Dr. Bowen's testimony because the rest of the testimony is inadequate to show anything more than eccentricity plus oc-

casionally irrational conduct. Except for this opinion by Dr. Bowen, there is, even according to Dr. Sauthoff, a possibility of temporary improvement or lucid intervals, and since the weight of the testimony as to his conduct on November 6th is all in favor of his sanity on that date, when he refinanced his farm, paid several of his debts, and made his will, it is evident that if the trial court is to be supported it must be upon the basis of Dr. Bowen's flat opinion that he was irrational during this period.

We have studied this case with deep concern and have come to the conclusion that the findings of the trial court are against the great weight and clear preponderance of the evidence; that the evidence shows decedent to have been clearly insane from 1932 to 1936; that he suffered from a disease permanently injuring his brain tissues, but one which would not exclude mental improvement and lucid intervals; that he clearly had these intervals up to the middle of October; that while Dr. Bowen is of the view that he was permanently and hopelessly irrational from that time until the time of his death, the evidence is undisputed that during portions of that time he operated his farm successfully; that on the day of the execution of the will he took part in a refinancing transaction by which he borrowed money locally, and in fact, from one of the witnesses who testified in support of contestants. It is undisputed that on this day he paid bills and did errands. There is no serious reflection upon his conduct that day. The draftsman and the witnesses to the will testified to his mental soundness on that day. The evidence preponderates in favor of the conclusion that he was at times competent and at others incompetent. There is no evidence of undue influence; there is no evidence that anybody took the initiative in having him draw a will. While the will cuts off his children, several circumstances militate against considering that an important factor. In the first place, due to his incarceration in the hospital and to the

subsequent divorce, his relations with his children, while not unfriendly were not intimate; second, the property which he disposed of by this will was inherited by him from his mother a comparatively short time before he died and after his family had been disrupted. There is nothing to indicate that this comparatively recent windfall from his mother's estate could not, with a considerable degree of equity, have been devised to his brother who, by the way, had put in an unsuccessful claim against the estate, and evidently considered that he had some equities in the mother's property.

In summary, the evidence of decedent's incompetency does not, except for that of Dr. Bowen, exclude the possibility of lucid intervals during the last month of decedent's life. While Dr. Bowen's testimony in general covers the period, it covers a greater period than his personal observation would warrant, and is in our opinion outweighed by testimony that on the very day of the will testator knew what he was doing.

While recognizing that this case has had the conscientious attention of a competent and able county judge, we are of the view that the will should have been admitted to probate.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.

RECTOR, J., took no part.